UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 14-23371-CIV-WILLIAMS

DIANE ABURTO,

    Plaintiff,

vs.

PENELOPE AQUINO,

    Defendant.
_____/

## ORDER

**THIS MATTER** is before the Court following a jury trial held on March 24, 2016 and March 25, 2016. At the conclusion of Plaintiff Diane Aburto's case, Defendant Penelope Aquino moved *ore tenus* for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The Court granted Aquino's motion. This Order follows.

### I. BACKGROUND

#### A. Procedural History

On September 11, 2014, Aburto brought this case against Aquino, the owner of a condominium that Aburto rented from February 2013 to September 2014, and Neo Lofts Condominium Association ("Neo Lofts"), the organization that administered the building in which the condominium was located. (DE 1). Aburto and Neo Lofts agreed to a joint stipulation of dismissal on February 11, 2015 (DE 28), and the Court entered an Order (DE 30) dismissing Neo Lofts from the case the next day.

In her Complaint, Aburto alleged that she is a "person with disabilities" (DE 1 ¶ 1) suffering from "an anxiety disorder" (*id.* at ¶ 8) and that in "order to have equal use and

enjoyment of her home, as well as to help alleviate the effects of her chronic disabilities, it is imperative that [she] has the ability to live with her dog as an emotional support animal[.]" (*Id.* at ¶ 9). That dog is "a young male pit bull named 'Deuce.'" (*Id.* at ¶ 10). According to the Complaint, after Aquino found out that Aburto had acquired Deuce, and despite Aburto's alleged provision of "reliable verification of her disability-related need for accommodation" (*Id.* at ¶ 11), Aquino served Aburto with notice to vacate the condominium. (*Id.* at ¶¶ 12-13). Aburto claimed that Aquino thus denied her a dwelling due to her disability in violation of the Fair Housing Act (the "FHA"), 42 U.S.C. § 3604(f)(1)(A). (DE 1 ¶¶ 26-34).

Due to issues with service, Aquino did not file a responsive pleading until August 3, 2015, almost a year after Aburto filed the Complaint with the Court. (DE 46). After minimal discovery that did not include a single deposition, Aquino and Aburto filed cross-motions for summary judgment and partial summary judgment, respectively. (DE 81, 82). The Court denied the cross-motions on March 24, 2016, and the case proceeded to trial.

### B. Evidence Adduced at Trial

At trial, Aburto called three witnesses: her therapist Lorraine Diston, herself, and her friend Tracey Bony.

### 1. Testimony of Lorraine Diston[1]

Diston described herself as a clinical psychologist and Aburto as her patient. (Trial Transcript ("Tr.") (Mar. 24, 2016) at 1:1-15).[2] Diston and Aburto met for their first

---

[1] Aburto untimely attempted to qualify Diston as an expert witness four weeks before trial. (DE 98). The Court did not allow Diston to testify as an expert, but did allow Diston to testify in her capacity as Aburto's treating physician. (DE 109 at 2).

2

face-to-face session in May 2014.  (*Id.* at 2:24-25).  During this meeting, Diston diagnosed Aburto with "panic disorder" and "generalized anxiety disorder."  (*Id.* at 1:13-15, 11:22-25).   Diston made this diagnosis based on Aburto's self-reported symptoms:

> DISTON:  I asked her different questions[,] she gave me answers[.]  I asked for specific symptoms[,] she would tell me yes or no to the ones she indicated applied to her life[,] she was experiencing[.] [T]hat leads to the diagnosis.

(*Id.* at 3:6-9).  Diston confirmed that this was her normal diagnostic procedure and that she regularly diagnoses patients with panic and anxiety symptoms "in 20 minutes."  (*Id.* at 11:22-25).

After diagnosing Aburto, Diston recommended that Aburto obtain an emotional support animal, but left the actual decision to Aburto:

> ABURTO'S COUNSEL: What recommendations did you make to Ms. Aburto regarding [an] emotional support animal . . . if any?
>
> DISTON:  I suggested if [an emotional support animal] was something [Aburto] had thought would be applicable to her it has been helpful to many in the past and there is a lot of research to back that up. There were other recommendations that I made[:] yoga is one[,] meditation is another one. I typically make these recommendations to my patients who have similar symptoms.

(*Id.* at 4:2-9).  Soon after Diston diagnosed Aburto, Aburto got Deuce.  (*Id.* at 11:2-7).

After May 2014, Diston and Aburto had only two more face-to-face meetings and "a couple phone conversations."  (*Id.* at 2:24-3:4).  Diston was unclear about whether her phone conversations with Aburto, which she later testified happened "three times a month" (*Id.* at 7:2-3), were even about Aburto's health, or were instead about unspecified "other issues" or possibly even about Aburto's "case" against Aquino.  (*Id.* at

---

[2] This Order references trial transcripts obtained from the Court Reporter.  Pagination and exact quotations are subject to change.

3

15:13-21). Diston also alluded to a professional relationship with Aburto outside of their doctor-patient relationship:

> AQUINO'S COUNSEL: Isn't it true you have reviewed Ms. Aburto on [Avvo] which is a referral service before?
>
> DISTON: Yes.
>
> AQUINO'S COUNSEL: You have?
>
> DISTON: Yes.
>
> AQUINO'S COUNSEL: Isn't it true you and Ms. Aburto have become friends?
>
> DISTON: Not in a social sense in a professional sense.

(*Id.* at 9:2-8).[3]

## 2. Testimony of Diane Aburto

Aburto testified that she has had problems with panic attacks since high school, but was only formally diagnosed as a law student at Florida Coastal School of Law. (*Id.* at 17:5-15). She stated that her panic attacks induce sweat, increased heart rate, an inability to focus, and crippling fear. (*Id.* at 18:12-22). Aburto testified that she sought treatment from Diston because the panic attacks were triggered by regular occurrences such as stressful situations or large crowds. (*Id.* at 19:6-16).

---

[3] During her testimony, Diston did not provide details about the extent and nature of her professional relationship with Aburto. The Avvo review she mentioned demonstrates that she had been working with Aburto, an immigration lawyer, "for about 3 years, conducting evaluations for some of her clients, and providing therapy for others." http://www.avvo.com/attorneys/33130-fl-diane-aburto-3341201/reviews.html (last accessed April 20, 2015). Because Diston's review was only referenced and not introduced in evidence, it does not bear on the Court's analysis or conclusion here. *See Rowe v. Gibson*, 798 F.3d 622, 628 (7th Cir. 2015) ("[W]e must acknowledge the need to distinguish between judicial web searches for mere background information that will help the judges and the readers of their opinions understand the case . . . and web searches for facts normally determined by the factfinder after an adversary procedure that produces a district court or administrative record.").

4

Without offering detail or corroboration, Aburto testified that her panic attacks interfere with her work, sleep, and concentration. (*Id.* at 19:16-17, 19:24-20:9). Nonetheless, Aburto has enjoyed a successful career as an attorney:

> ABURTO: . . . I am blessed enough to be a partner in my firm so if I have to take time off of work or refile[] things I am able to do that. I have had panic attacks in trial. I have been lucky enough to have judges understand and they usually will give me some time to [go] to the bathroom and compose myself and come back. It is something I deal with on a daily basis.

(*Id.* at 19:17-23).

In February 2013, Aburto moved into Aquino's property, a condominium in the Neo Lofts building that she rented on a formal lease lasting from February 2013 to January 2014. (*Id.* at 24:8-10); (Ex. 1). Aburto knew that after the expiry of her lease, she would be a month-to-month tenant under Florida law, which meant that she could be evicted on 15 days' notice from Aquino. (Tr. (Mar. 24, 2016) at 33:8:17). And despite also knowing that pit bulls were prohibited by a Miami-Dade county ordinance and that her lease first required a pet deposit or written approval from Aquino,[4] Aburto obtained Deuce — a pit bull puppy — in May 2014, five months after she commenced a month-to-month tenancy.[5] (*Id.* at 22:1-6, 38:10-39:1, 39:9-13).

---

[4] The lease contains a provision that reads: "Unless this box ☐ is checked or a pet deposit has been paid, Tenant may not keep or allow pets or animals on the Premises without Landlord's approval of the pet or animal in writing." (Ex. 1). The box was unchecked. (*Id.*).

[5] Although Aburto had contacted the property manager, Aquino's father Rafael Aquino, about extending her lease, a signed agreement was never reached. (Tr. (Mar. 24, 2016) at 25:19-22, 27:9-16).

5

Aburto never told Aquino about Deuce because she "did not think it would be a problem" as "the building was a dog friendly building." (*Id.* at 27:17-25). While Aquino remained unaware of Deuce's presence, Neo Lofts complained to Aburto because Deuce urinated in the building's public elevator. (*Id.* at 32:9-21). As to this, Aburto testified, "I had put him in the elevator to take him for a walk but he peed because he was not potty trained yet in the elevator and I did not have a chance to go back and clean up because they have people who are cleaning constantly." (*Id.* at 32:11-15). Aquino eventually found out about Deuce after receiving a call from Neo Lofts. (*Id.* at 28:11-17).

Aquino called Aburto on August 27, 2014, three months after Aburto acquired Deuce, to talk about the complaints and to ask more generally about Deuce's presence in the condominium. (*Id.* at 28:11-29:4). According to Aburto, they had a ten-minute conversation where she explained to Aquino that she had obtained Deuce "on a recommendation of my psychologist Dr. Diston" and that "trying to kick me out was illegal." (*Id.*). In response, Aquino expressed hesitation about Deuce and noted her right, as the property owner, to determine whether Aburto could have Deuce in the unit. (*Id.*). Aburto countered by threatening suit and claiming "you can't kick me out because of my dog." (*Id.*).

The same day, after the phone conversation ended, Aquino sent an email to Aburto containing notice to vacate the condominium, reading in relevant part:

Dear Diane Aburto,

It was a pleasure speaking to you earlier.

Please accept this as notice to terminate our existing month to month tenancy agreement of the premises . . . . This termination is to be effective on September

6

15, 2014. If this date is unsuitable please respond to this email within 48 hours and we may agree [to] an alternative date.

(Ex. 2). Aquino's email to Aburto mentions neither Aburto's medical conditions nor Deuce. (*Id.*). In responses emailed the next day and on September 10, 2014, Aburto threatened suit and advised Aburto to obtain counsel. (Exs. 3, 4). Eventually, with Aquino's agreement, Aburto moved out of the condominium on September 30, 2014. (Tr. (Mar. 24, 2016) at 34:9-14).

### 3. Testimony of Tracey Bony

Aburto's third and final witness was her friend, Tracey Bony. Bony testified that she witnessed Aburto having "a couple of panic attacks" during social situations, (Tr. (Mar. 25, 2016) at 3:23-4:6), but that Aburto would excuse herself and return composed within 20 to 30 minutes. (*Id.* at 9:18-10:2). Aburto could "step away and come back, like, regain her confidence and come back to the socializing." (*Id.* at 3:25-4:6). Bony's descriptions of Aburto's panic attacks echoed Aburto's descriptions, down to the physiological impacts and Aburto's ability to regain her composure with time. (*Id.* at 4:7-15). Bony also testified, based on limited firsthand observation and what Aburto told her, that panic attacks affect Aburto's sleep, work, and concentration:

> AQUINO'S COUNSEL: You knew that because she told you; not because you actually saw her not sleeping; correct?
>
> BONY: Correct.
>
> AQUINO'S COUNSEL: And you said that she had problems at work; you never went to work with her, you're not a lawyer, you don't work with her; correct?
>
> BONY: No, but I know her.
>
> AQUINO'S COUNSEL: Because she would tell you?

7

>BONY: Yes.

(*Id.* at 10:15-23).

Bony also testified that Aburto got Deuce a few months after she and Aburto had "traveled and went away." (*Id.* at 5:12-15).[6] Bony also witnessed Aburto have a panic attack while Aburto was explaining the situation following her August 27, 2014 conversation and ensuing correspondence with Aquino. (*Id.* at 8:1-8).

## II. STANDARD OF REVIEW

In considering Aquino's motion for judgment as a matter of law, this Court "must consider all the evidence in the light most favorable to [Aburto], and independently determine whether the facts and inferences point so overwhelmingly in favor of [Aquino] . . . that reasonable people could not arrive at a contrary verdict." See *Bruno v. Monroe Cty.*, No. 07-10117-CIV, 2009 WL 2762641, at *1 (S.D. Fla. Aug. 31, 2009) (quoting *Webb–Edwards v. Orange Cty. Sheriff's Office*, 525 F.3d 1013, 1029 (11th Cir. 2008)) (internal quotation marks and citation omitted).

The Court reviews the evidence presented at trial because once "the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *Acosta v. James A. Gustino, P.A.*, --- F. App'x ----, 2016 WL 1104025, at *1 (11th Cir. Mar. 22, 2016) (per curiam) (citing *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011)).

---

[6] Bony's testimony demonstrated that Aburto was able to travel and partake in social activity before she acquired Deuce.

8

## III. DISCUSSION

The FHA prohibits discrimination in housing on the basis of disability.[7] *See Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1218 (11th Cir. 2016). Aburto's claim is that Aquino made a dwelling unavailable on account of Aburto's disability in violation of the FHA, 42 U.S.C. § 3604(f)(1)(A). Although the Eleventh Circuit has never "expressly set forth the elements of a section 3604(f)(1) claim" for making a dwelling unavailable on grounds of disability, *Hunt*, 814 F.3d at 1221, FHA claims for a denial of a dwelling and for failure to provide a reasonable accommodation are similar and thus require similar proof. *See Falin v. Condo. Ass'n of La Mer Estates, Inc.*, No. 11-61903-CIV, 2012 WL 1910021, at *3 (S.D. Fla. May 28, 2012) (holding reasonable accommodation and denial of dwelling claims are "duplicative" and "redundant"). In the reasonable accommodation context, the plaintiff must prove, among other things, that she has a "disability" within the meaning of the FHA and that the defendant was on notice about that disability. *See Schwarz v. The Villages Charter School, Inc.*, --- F. Supp. 3d ----, 2016 WL 787934, at *23 (M.D. Fla. Feb. 29, 2016) (citing *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014)) (requiring proof that plaintiff "is disabled within the meaning of the FHA" and "requested a reasonable accommodation" to state an FHA claim for failure to provide a reasonable accommodation); *McHale v. Water's Edge Ass'n, Inc.*, No. 1:14-cv-23381-UU, 2014 WL 7883602, at *4 (S.D. Fla. Dec. 1, 2014) (citing *Bhogaita*, 765 F.3d at 1285). Similarly, for denial of dwelling claims, a plaintiff

---

[7] The Court uses the term "disability" rather than the FHA's defined term "handicap" in accord with the preferences of disability scholars and the Eleventh Circuit. *See Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 n.2 (11th Cir. 2014).

9

must show a disability within the meaning of the FHA and that defendants knew about that disability in order to prevail on the merits. *See Radecki v. Joura*, 114 F.3d 115, 116 (8th Cir. 1997) (per curiam) (affirming trial court's listed elements of section 3604(f)(1) claim, including proof of plaintiff's cognizable disability and defendant's knowledge of plaintiff's disability); *Matarese v. Archstone Pentagon City*, 761 F. Supp. 2d 346, 357-59 (E.D. Va. 2011) (denying defendant's motion for summary judgment on 3604(f)(1) claim because genuine issue of material fact existed as to whether plaintiff had a cognizable disability); *Potomac Grp. Home Corp. v. Montgomery Cty., Md.*, 823 F. Supp. 1285, 1295 (D. Md. 2005) ("The initial inquiries which the Court must make in this case are whether elderly residents of Potomac's group homes are 'handicapped' within the meaning of § 3604(f)(1) . . . ."); *Baxter v. City of Belleville, Ill.*, 720 F. Supp. 720, 728 (S.D. Ill. 1989) ("The main thrust of section (f)(1) is to prohibit discrimination in housing based upon handicap. Therefore, the Court must determine whether persons infected with HIV are handicapped within the meaning of the statute."). Thus, to prove her section 3604(f)(1) claim, Aburto must prove that she has a cognizable disability within the meaning of the FHA and that Aquino was on notice about her disability.

The FHA defines a "disability" as: "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h); *see also Bhogaita*, 765 F.3d at 1287. Aburto presented no competent evidence that Aquino regarded her as disabled. *See Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (affirming summary judgment for the defendant because the plaintiff could not show that alleged discriminators regarded him as

10

disabled despite evidence of "personality conflicts"). Neither did Aburto present competent evidence that she offered Aquino any record of having an impairment. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999) (affirming summary judgment for defendant because plaintiff "had not furnished any evidence that [defendant] had any record" of her purported disability). Therefore, the Court must determine whether Aburto demonstrated a physical or mental impairment that substantially limits one or more of her major life activities.

In determining whether an FHA plaintiff has a physical or mental impairment that substantially limits one or more major life activities, courts rely on preamendment[8] Americans with Disabilities Act ("ADA") cases "because of the similarity between the preamendment ADA and the FHA." *See Bhogaita*, 765 F.3d at 1288. Under the preamendment ADA, whether a physical or mental impairment substantially limits one or more major life activities is a "severe standard" which entails a three-step analysis:

> First, a plaintiff must demonstrate that he is impaired. Second, a plaintiff must identify the life activity that is impaired and demonstrate that it is a "major life activity" . . . . Finally, a plaintiff must show that the impairment substantially limits that life activity. Substantially limits is a severe standard and must include permanent or long-term restrictions on performance of the life activity.

---

[8] The reference to the "preamendment" ADA is important because "Congress made significant changes to the ADA by enacting the ADA Amendments Act of 2008 (the 'ADAAA'), Pub. L. No. 110–325, 122 Stat. 3553." *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1267 (11th Cir. 2014). Although the ADA's standard for determining the existence of a disability has been relaxed by the ADAAA, the Parties have cited no case for the proposition that the standard has been similarly relaxed in the FHA context. *See Mazzeo*, 746 F.3d at 1268 (noting that "[w]hen it enacted the ADAAA, Congress indicated that one of its purposes was to 'convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'") (citation omitted). More importantly, the Eleventh Circuit has continued analogizing the FHA to the preamendment ADA, even years after passage of the ADAAA. *See Bhogaita*, 765 F.3d at 1288.

11

*Roig v. Miami Fed. Credit Union*, 353 F. Supp. 2d 1213, 1216 (S.D. Fla. 2005) (granting defendant's motion for summary judgment because plaintiff presented no evidence that his condition substantially impaired him from participating in any major life activity) (citations omitted).

For example, in *Bhogaita v. Altamonte Heights Condominium Association*, No. 6:11-cv-1637-Orl-31DAB, 2012 WL 6562766, at *1 (M.D. Fla. Dec. 17, 2012), *aff'd* 765 F.3d 1277 (11th Cir. 2014), the plaintiff, a "veteran of the United States Air Force who suffer[ed] from Post–Traumatic Stress Disorder resulting in 'chronic anxiety' and depression," successfully sued his condominium association under the FHA when it refused to make an accommodation for his dog to their policy prohibiting pets over 25 pounds.  The jury's verdict in Bhogaita's favor was supported by a letter from his treating psychiatrist, who explained:

> [Bhogaita's PTSD] limits his ability to work directly with other people, a major life activity.  Currently he has been hired to perform technical support work from home.  He is able to work with the assistance of his emotional support animal.  Otherwise his social interactions would be so overwhelming that he would be unable to perform work of any kind.

*Id.* at *2. On appeal, the Eleventh Circuit affirmed the jury's finding that Bhogaita's condition substantially limited a major life activity because there was "ample evidence at trial to show that his PTSD left him unable to work in a broad class of jobs." 765 F.3d at 1288.

In contrast, conclusory, vague, or contradictory evidence is insufficient to meet the high standard for proving a "disability" under the FHA. *See Rossbach v. City of Miami*, 371 F.3d 1354, 1358-59 (11th Cir. 2004); *Hilburn*, 181 F.3d at 1228; *Hawn v. Shoreline Towers Phase 1 Condo. Ass'n, Inc.*, 347 F. App'x 464, 465 (11th Cir. 2009);

12

*Peklun v. Tierra Del Mar Condo. Ass'n, Inc.*, No. 15-CIV-80801, 2015 WL 8029840, at *9 (S.D. Fla. Dec. 7, 2015). For example, in *Rossbach*, the plaintiffs failed to offer sufficient proof that they had "disabilities" under the preamendment ADA, leading the trial court to reverse a jury verdict and enter judgment as a matter of law for the defendant. *Rossbach*, 371 F.3d at 1359 (affirming trial court). There, the plaintiffs offered testimony "couched in vague terms and unaccompanied by any evidence that the described afflictions were worse than is suffered by many adults." *Id.* They were unable to show that their purported disabilities made them unable to engage in the major life activity of work, rather than just unable to work the "narrow range of jobs" they desired. *Id.* at 1361. And in denying the plaintiffs' claims that their disabilities substantially limited the major life activity of sleeping, the Court found that "[d]ifficulty sleeping is extremely widespread" and that the plaintiffs could not prove their sleeping problems were "worse than is suffered by a large portion of the nation's adult population." *Id.* at 1358 (quoting *Colwell v. Suffolk Cty. Police Dep't*, 158 F.3d 635, 644 (2d Cir. 1998)).

Nor can a plaintiff prove a "disability" based on a conclusory statement of impact on a major life activity, even if that statement is from a medical doctor. *See Hilburn*, 181 F.3d at 1228. In *Hilburn*, the plaintiff claimed a cognizable disability under the preamendment ADA by virtue of coronary heart disease, arguing that the disease substantially limited her performance of the major life activities of "running, performing manual tasks, lifting, and working." 181 F.3d at 1227. Despite an affidavit from the plaintiff's doctor that she had a "diminished activity tolerance for . . . running," the Eleventh Circuit affirmed the district court's grant of summary judgment for defendant

13

because the doctor's affidavit was conclusory. *Id.* at 1227-28; *accord. Douglas Energy Relief Ass'n v. City of Douglas, Ga.*, 556 F. App'x 820, 825 (11th Cir. 2014) (courts do "not accept legal conclusions unsupported by the facts"); *Gilliard v. Georgia Dep't of Corr.*, 500 F. App'x 860, 870 (11th Cir. 2012) (holding plaintiff not "disabled" within meaning of the ADA when she did "not present more than a scintilla of evidence establishing that her physical or mental conditions were severe, long-term, or permanent" or that "her difficulties walking, sitting, standing, concentrating, and thinking were any worse than similar afflictions suffered by many adults"); *Weatherford v. Nevada Rural Hous. Auth.*, 946 F. Supp. 2d 1101, 1113 (D. Nev. 2013) (granting summary judgment to defendant on FHA discrimination claim because plaintiff presented no documentation of a disability).

Here, Aburto established that she had episodic panic attacks and anxiety. However, she did not establish that her condition substantially affected a major life activity. *See Rossbach*, 371 F.3d at 1357-62 (holding vague and conclusory assertions insufficient to prove substantial limitation of a major life activity under the preamendment ADA); *Hilburn*, 181 F.3d at 1227-28 (11th Cir. 1999) (holding doctor's "conclusory statement is insufficient to create a genuine issue of material fact"). Further, Aburto's witnesses offered only conclusory testimony, often contradicted by other testimony, that her panic attacks affected her work, sleep, and concentration.

For example, Aburto and Bony both claimed that panic attacks impact Aburto's ability to work, yet Aburto also said she has been able to work through the attacks to achieve professional success as a lawyer. Aburto offered no testimony that she is unable to work a broad class of jobs and actually testified that she is successful in her

14

chosen career.  With regard to the major life activity of work, "an impairment substantially limits one's ability to work only where it renders a person 'unable to work in a broad class of jobs.'" *Bhogaita*, 765 F.3d at 1288 (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999)).  In contrast to this case, the Eleventh Circuit in *Bhogaita* held that the plaintiff's condition substantially affected the major life activity of work in part because he was "able to work with the assistance of his emotional support animal.  Otherwise his social interactions would be so overwhelming that he would be unable to perform work of any kind." *Id.* at 1282.  Aburto offered no evidence that she needed Deuce to work or that Deuce regularly accompanied her to work.

Similarly, Aburto and Bony said Aburto has difficulty sleeping, but "there was no allegation that such difficulties were substantially worse than symptoms suffered by many Americans." *Rossbach*, 371 F.3d at 1358; *see also Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999) (holding plaintiff's conclusory testimony and doctor's **detailed sleep records insufficient** to show substantial impairment of the major life activity of sleeping) (emphasis added).  Because there was no attempt to show the severity of Aburto's sleep deprivation relative to others, no records of her sleep issues, and no evidence of her problems sleeping other than conclusory testimony, the record is devoid of any competent evidence that her condition substantially impacted her major life activity of sleep.  Finally, Aburto's evidence about how her condition impacted her concentration is unavailing for a more fundamental reason: concentration is not a major life activity for purposes of analyzing whether a plaintiff has a "disability."  *See Pack*, 166 F.3d at 1305; *Phillips v. Wal-Mart Stores, Inc.*, 78 F. Supp. 2d 1274, 1281-82 (S.D.

Ala. 1999); *Robinson v. Hoover Enters., Inc.*, No. 1:03-CV-2565-TWT, 2004 WL 2792057, at *5 n.5 (N.D. Ga. Oct. 20, 2004).

No reasonable jury could find that this testimony proved that Aburto was "disabled" under the FHA. See *Hilburn*, 181 F.3d at 1227; *Peklun*, 2015 WL 8029840, at *4 (holding that because there were "no supportive facts . . . provided to buttress the vague and conclusory assertion that Peklun has" limited functioning capacity, his cardiac issues did not substantially limit a major life activity and could not support a finding of "disability"). Further, mere assertion of a "disability" does not render a claim cognizable under the FHA.[9] In *Sun Harbor Homeowners' Association v. Bonura*, 95 So. 3d 262, 270 (Fla. 4th DCA 2012), the court found that conclusory letters from the plaintiff to the defendant merely stating that her emotional support animal was necessary to her enjoyment of her property because of her disability were insufficient to establish a disability under the FHA. *Id.* at 269-70. Similarly, Aburto's unsupported assertions of disability to Aquino are insufficient to prove that she actually has a "disability" under the FHA. This is particularly true because Aburto offered little independent proof of substantial impairment of a major life activity and because Aburto was able to travel and work without Deuce. See *Bonura*, 95 So.3d at 270. In fact, the

---

[9] Aburto's counsel made this argument at trial:

> THE COURT: You're advancing a proposition of law that under the Fair Housing Act, in order to prove your claim, you need only say to your landlord, "I have a disability," without more. . . . [and] the mere assertion . . . is sufficient? Is that what you're saying? If that's not what you're saying, that's fine, but I just want to know.
>
> ABURTO'S COUNSEL: That is what I'm saying.

(Tr. (March 25, 2016) at 21:14-25).

16

scant evidence adduced militates against a finding that Aburto was "disabled" under the meaning of the FHA because it shows that Aburto's panic attacks lasted for short periods of time and had no permanent impact on her life or career. *See Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996) ("[C]ourts should consider the following three factors when determining whether an impairment substantially limits a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."). Because proof of a disability is a requisite element of Aburto's FHA section 3604(f)(1) claim, the Court granted Aquino's *ore tenus* motion for judgment as a matter of law.[10]

## IV. CONDUCT OF THE CASE

Under the FHA, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs." 42 U.S.C. § 3613(c)(2). While the Court is aware of no binding precedent on the question, there is convincing authority that a prevailing defendant seeking attorney's fees in an FHA case must show that a plaintiff's claims were frivolous, unreasonable, or without foundation. *See*

---

[10] Neither did Aburto present evidence at trial sufficient to prove that Aquino had adequate notice of the purported disability. In *Hawn v. Shoreline Towers Phase 1 Condominium Association*, 347 F. App'x 464 (11th Cir. 2009), the Eleventh Circuit assumed that Hawn had a disability within the meaning of the FHA, but granted summary judgment for the defendant because Hawn's conclusory doctor's letters had not placed the defendant on notice of his disability. *Id.* at 467-68. Aburto testified that three months after she acquired Deuce, she explained her condition to Aquino during a ten-minute phone conversation. This conversation only took place because Neo Lofts contacted Aburto for failing to clean up after Deuce when he urinated in the building's elevator. Aburto also offered into evidence two emails to Aquino immediately after the conversation in which she threatened suit without describing her disability. Unlike the plaintiff in *Hawn*, Aburto never even provided Aquino a letter from Diston or another physician. *See id.* at 466.

17

*Claiborne v. Wisdom*, 414 F.3d 715, 719-20 (7th Cir. 2005); *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 757 (2d Cir. 1998); *Bryant Woods Inn, Inc. v. Howard Cty., Md.*, 124 F.3d 597, 606 (4th Cir. 1997); *Foster v. Barilow*, 6 F.3d 405, 408 (6th Cir. 1993); *Wells v. Willow Lake Estates, Inc.*, No. 09-60024-CIV, 2010 WL 572731, at *1 (S.D. Fla. Feb. 17, 2010) (quoting *Sullivan v. School Bd. of Pinellas Cty.*, 773 F.2d 1182, 1188 (11th Cir. 1985)).

The FHA is a shield against discrimination for individuals with cognizable disabilities, and the law requires that a plaintiff prove a cognizable disability which substantially limits a major life activity to succeed on the merits of a claim. *See Bhogaita*, 765 F.3d at 1285. Although the Court has noted that invoking the FHA in talismanic fashion without competent evidence is insufficient to sustain a claim, (Tr. (Mar. 25, 2016) at 27:5-28:6; DE 59 at 4 n.3, n.4), the Court has also declined to make a finding that Aburto's pleading was frivolous. (DE 84). Thus, Aquino faces a challenge in persuading the Court to exercise discretion in awarding her attorneys' fees, especially in light of her conduct in this litigation.[11]

## V. CONCLUSION

For the reasons stated above and by the Court at trial on March 24, 2016, and March 25, 2016, it is **ORDERED AND ADJUDGED** that:

1. Plaintiff's motion for partial summary judgment (DE 82) is **DENIED**.
2. Defendant's motion for summary judgment (DE 81) is **DENIED**.

---

[11] Aquino apparently evaded service for almost a year (DE 84 at 2 n.1), failed to develop a record on the central issues by neglecting to engage in basic discovery, and pressed defenses that were facially flawed. (DE 81 at 5-6).

---

3. Defendant's *ore tenus* motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure is **GRANTED**.

4. Defendant shall submit a proposed order for the entry of final judgment within ten (10) days of the date of this Order.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 20th day of April, 2016.

```
_____
KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE
```